1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    THOMAS MONTALVO,

11              Petitioner,                No. CIV S-08-CV-00627 LLK CHS P

12         vs.

13    D.K. SISTO,

14              Respondent.             FINDINGS AND RECOMMENDATIONS

15    _____/

16    I.    INTRODUCTION

17              Petitioner, Thomas Montalvo , is a state prisoner proceeding pro se with a petition

18    for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.   Petitioner is currently serving an

19    indeterminate life sentence following his 1988 convictions in Shasta County Superior Court for

20    attempted murder, auto theft, and second degree robbery.   Here, petitioner does not challenge the

21    constitutionality of those conviction, but rather, the execution of his sentence, and specifically, the

22    May 18, 2007 decision by the Board of Parole Hearings (the "Board") finding him unsuitable for

23    parole.

24    II.   ISSUES PRESENTED

25              Petitioner claims that:

26         A.      The Board's 2007 decision to deny him parole was arbitrary

                                            1

because it was unsupported by any relevant or reliable evidence that he currently poses an unreasonable risk of danger to society, in violation of his federal right to due process.

B.   The Board's 2007 decision to deny him parole extended his term of imprisonment beyond the statutory maximum term of confinement for his convicted offense based on facts not proven beyond a reasonable doubt.

C.   The California Code of Regulations governing parole determinations are void and unconstitutional.

Upon careful consideration of the record and applicable law, it is recommended that this petition for writ of *habeas corpus* relief be denied.

III.   FACTUAL BACKGROUND

The basic facts of Petitioner's life crime were summarized from the deputy probation officer's report at his May 18, 2007 parole suitability hearing:

Officer Cunningham contacted the victim, who indicated that the previous day she had received a telephone call regarding a vehicle which she had advertised in the paper for sale. The victim met with Mr. Montalvo on Lake Boulevard at a store. . . .  Mr. Montalvo, indicated that he wished to purchase the vehicle and that he would get a check for the vehicle at that time.

According to the victim, she met Mr. Montalvo again at the same store and then later drove to Mr. Montalvo's residence, where his mother was to provide a check. The victim further indicated that they drove to an area off Keswick Dam Road, where Mr. Montalvo pulled over to the side of the road and then exited the vehicle. At this point he bent over the car, looking into the driver's window and she observed a weapon.

Mr. Montalvo told her to get out of the vehicle, at which time she exited on the passenger side. Montalvo had her walk approximately 50 feet away from the vehicle down a dirt road and had her kneel on the gravel. The victim stated she was asking Montalvo not to shoot her because she had two children and would not tell anyone if he would just leave her alone and take the vehicle. Mr. Montalvo shot her in the right leg. The victim indicated that she fell to the left, landing on her side, and tried to act like she was dead, but Mr. Montalvo shot her again anyway.

After the second shot, the victim stated she felt her hands and arms twitching, she did not realize where she had been shot. Again, the victim made her hands go limp and acted as if she were dead and she

2

heard the suspect, Mr. Montalvo, run away.  The vehicle started and left the area.  The victim then stated she crawled up to Keswick Dam Road, where she flagged down a passing motorist to give her a ride to the hospital.  According to the victim, Mr. Montalvo had also left the area with her purse in the vehicle.  The victim was able to give a good description of Mr. Montalvo, as well as provide and [sic] address on August Way.

Several sheriff's deputies went to the described address on August Way, observed the stolen vehicle drive into the area and a man who fit the description provided by the victim.  Initially, Mr. Montalvo indicated he had just purchased the vehicle from the victim, and that he had last seen her at a restaurant located on Lake Boulevard.

As the interview progressed the information was obtained that the parents of the defendant's girlfriend had recently had a burglary in which three weapons were stolen, one of them believed to be the weapon that had shot the victim.  As Mr. Montalvo was appraised of this, he finally admitted to the shooting of the victim with a .25 automatic pistol, which had been stolen approximately two months earlier from his girlfriend's residence.

Now we'll skip down to the bottom of page three where it says defendant statement on the last paragraph.

On July 1, 1987, Ms. Jackson came to my home at 11:00 a.m., we went out to Keswick Dam Road and I asked her to please get out of the car.  I did raise a gun at her, but I did not plan on using it at all.  I then asked Ms. Jackson to walk down this little trail and to turn to the left where there was a cove.  She was crying and said, quote, that nothing had been going right since we moved to Redding.  I told her, don't worry, I'm not going to hurt you, please be quiet.  She just got louder and louder.  I didn't know what I was doing.  I did not plan anything, it just happened.  I turned my head and fired twice and ran to the car and left.

(Transcript of May 18, 2007 Hearing, Pet. Ex. D at 21-24.)

Petitioner was convicted after a jury trial of attempted murder with the use of a firearm, auto theft, and second degree robbery.  The jury also found true a special circumstance: that the attempted murder was willful, premeditated and deliberate.  Petitioner was sentenced to life with possibility of parole on the attempted murder charge, plus an additional two years on the auto theft charge.  Petitioner's minimum eligible parole date passed on October 25, 1995.  On May 18, 2007, Petitioner appeared before the Board of Parole Hearings (the "Board") for a subsequent parole suitability hearing.  After considering numerous positive and negative suitability factors, the panel

1   concluded that Petitioner would pose an unreasonable risk of danger to society if released, and thus

2   he was not suitable for parole.  Petitioner then sought *habeas corpus* relief in the Shasta County

3   Superior Court.   On December 4, 2007, the court denied the petition, finding the Board's

4   determination that petitioner was unsuitable for parole was supported by some evidence in the

5   record. Petitioner then sought relief in the state appellate court. The California Court of Appeal for

6   the Third Appellate District denied the petition summarily.  The California Supreme Court denied

7   review.   Petitioner filed this federal petition for writ of *habeas corpus* on March 21, 2008

8   Respondent filed an answer on July 20, 2009, and Petitioner filed a traverse on August 6, 2009.

9   IV.     APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

10              This case is governed by the provisions of the Antiterrorism and Effective Death

11   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after

12   its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

13   F.3d 1484, 1499 (9th Cir. 1997).   Under AEDPA, an application for a writ of habeas corpus by a

14   person in custody under a judgment of a state court may be granted only for violations of the

15   Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

16   375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits

17   in state court proceedings unless the state court's adjudication of the claim:

18              (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established federal law, as
19              determined by the Supreme Court of the United States; or

20              (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
21              State court proceeding.

22    28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one

23   methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide

24   its application.

25              First, AEDPA establishes a "highly deferential standard for evaluating state-court

26   rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether

the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*.  *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381).  In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause, a federal court may grant a writ of *habeas corpus* only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be

1  consistent with federal law. *Id*.

2      Under the "unreasonable application" clause, the court may grant relief "if the state

3  court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

4  the particular case." *Bell*, 535 U.S. at 694. As the Supreme Court has emphasized, a court may not

5  issue the writ "simply because that court concludes in its independent judgment that the relevant

6  state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

7  529 U.S. at 410. Thus, the focus is on "whether the state court's application of clearly established

8  federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

9      Finally, the petitioner bears the burden of demonstrating that the state court's

10  decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S.

11  at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

12  V.    DISCUSSION

13      A.    DUE PROCESS IN THE CALIFORNIA PAROLE CONTEXT

14      The Due Process Clause of the Fourteenth Amendment to the United States

15  Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due

16  process of law." U.S. CONST. AMEND. XIV, § 2. A person alleging a due process violation must

17  demonstrate that he or she was deprived of a protected liberty or property interest, and then show

18  that the procedures attendant upon the deprivation were not constitutionally sufficient. *Ky. Dep't.*

19  *Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th

20  Cir. 2002). A protected liberty interest may arise from either the Due Process Clause itself or from

21  state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). In the context of parole, the United

22  States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a

23  parole date, even one that has been set. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However,

24  when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that

25  parole release will be granted' when or unless certain designated findings are made, thereby giving

26  rise to a constitutional liberty interest." *McQuillan*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates*

1   *of Neb. Penal*, 442 U.S. 1, 12 (1979)).

2         Under California law, prisoners serving indeterminate prison sentences "may serve

3 up to life in prison, but they become eligible for parole consideration after serving minimum terms

4 of confinement." *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005). Generally, one year prior to an

5 inmate's minimum eligible parole release date, the Board will conduct a hearing to determine an

6 inmate's parole release date "in a manner that will provide uniform terms for offenses of similar

7 gravity and magnitude in respect to their threat to the public." *In re Lawrence*, 44 Cal. 4th at 1202

8 (citing CAL. PENAL CODE § 3041(a)). The Board "shall set a release date unless it determines that

9 the gravity of the current convicted offense or offenses, or the timing and gravity of current or past

10 convicted offense or offenses, is such that consideration of the public safety requires a more lengthy

11 period of incarceration...." CAL. PENAL CODE § 3041(b). California state prisoners who have been

12 sentenced to prison with the possibility of parole, therefore, have a clearly established,

13 constitutionally protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-

14 78 (quoting *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing

15 *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d

16 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

17         During a parole proceeding, it is well established that inmates are not guaranteed the

18 "full panoply of rights" afforded to criminal defendants under the Due Process Clause. *See Pedro*

19 *v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded

20 limited procedural protections. The Supreme Court has held that a parole board, at minimum, must

21 give an inmate the opportunity to be heard and a decision informing him of the reasons he did not

22 qualify for parole. *Hayward v. Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (quoting *Greenholtz*,

23 442 U.S. at 16). In addition, as a matter of state constitutional law, denial of parole to California

24 inmates must be supported by "some evidence" demonstrating future dangerousness. *Id*. at 562

25 (citing *In re Rosencrantz*, 29 Cal.4th 616, 128 (2002)). *See also In re Lawrence*, 44 Cal.4th 1181,

26 1191 (2008) (recognizing the denial of parole must be supported by "some evidence" that an inmate

"poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008) (same). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," *Cooke v. Solis*, No. 06-15444, slip op. (9th Cir. June 4, 2010), and compliance with this evidentiary standard is, therefore, mandated by the federal Due Process Clause. *Pearson v. Muntz*, No. 08-55728, slip op. at 5 (9th Cir. May 24, 2010). Thus, a federal court undertaking review of a "California judicial decision approving the...decision rejecting parole" must determine whether the state court's decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

A reviewing court's analysis of whether a California parole board's parole hearing decision was supported by "[some evidence] is framed by the [state's] statutes and regulations governing parole suitability determinations...." *Irons*, 505 F.3d at 851. Accordingly, this court must

> look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [] constituted an unreasonable application of the 'some evidence' principle."

*Id.*

Title 15, Section 2281 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for life prisoners. The regulation is designed to guide the Board's determination of whether the inmate would pose an "unreasonable risk of danger to society if released from prison," and, thus, whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th at 1202. The Board is directed to consider all relevant and reliable information available, including

> the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any

8

other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 CAL. CODE REGS. § 2281(b). The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 CAL. CODE REGS. § 2281(c)-(d). The overriding concern is public safety, *In re Dannenberg*, 34 Cal.4th 1061, 1086 (2005), and the focus is on the inmate's current dangerousness. *In re Lawrence*, 44 Cal.4th at 1205. Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a inmate's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008). Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." *In re Lawrence*, 44 Cal4th at 1212. In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *Id*. at 1227.

B.   PETITIONER'S DUE PROCESS RIGHTS WERE NOT VIOLATED BECAUSE THE BOARD'S DECISION IS NOT ARBITRARY AND IS SUPPORTED BY SOME EVIDENCE

Petitioner alleges that his Due Process rights were violated by the Board's 2007 decision finding him unsuitable for parole. Petitioner argues that the Board's decision was arbitrary because it was unsupported by any relevant or reliable evidence that he currently poses an unreasonable risk of danger to society, in violation of his federal due process rights. Petitioner contends that the Board failed to consider his disadvantaged upbringing, and improperly relied upon the gravity of his commitment offense, his non-violent prison disciplinary record, Dr. Van Couvering's psychological assessment opining that Petitioner presented a moderate risk of danger to the community, and his non-violent juvenile adjudications when making its parole suitability determination. Respondent, on the other hand, argues that Petitioner has been afforded all process

9

1   he was due in his parole proceeding because he was provided with an opportunity to be heard and
2   a statement of reasons for the Board's decision.  Respondent denies that Petitioner has a federally
3   protected liberty interest in parole.  Respondent also denies that "some evidence" is the proper
4   evidentiary standard under which this Court must evaluate the Board's decision.  Nonetheless,
5   Respondent also argues that Petitioner has failed to demonstrate that the Board's decision lacked
6   "some evidence" that Petitioner would pose an unreasonable risk of danger to society or a threat to
7   public safety if released on parole.

8          On the record in this case, the Board determined that Petitioner would pose an
9   unreasonable risk of danger to society or a threat to public safety if released from prison.  It is
10  apparent that the factors relied upon by the Board to deny Petitioner parole were sufficient to meet
11  the requirements imposed by the Due Process Clause.  The Board conducted Petitioner's suitability
12  hearing interactively with Petitioner regarding his attitude towards the commitment offense, his
13  criminal and social history prior to incarceration, letters of support and opposition, his discipline and
14  progress since his incarceration, his history of drug and alcohol use and treatment, his counselor's
15  report, and his psychological evaluations.  The transcript of Petitioner's parole hearing clearly
16  reflects that the Board found him unsuitable for parole based on the following factors: (1) the facts,
17  circumstances and nature of Petitioner's commitment offense; (2) Petitioner's criminal history; (3)
18  Petitioner's insufficient participation in self-help programming; (4) Petitioner's prison disciplinary
19  record; (5) Petitioner's most recent psychological evaluations; (6) Petitioner's insufficient
20  participation in vocational training and lack of post-release employment plans; and (7) Petitioner's
21  limited post-release residential plans.

22          In determining that Petitioner was unsuitable for parole, the Board relied in part on
23  the facts and circumstances of Petitioner's commitment offense.  A prisoner's commitment offense
24  can be a parole unsuitability factor if it was committed in an especially heinous, atrocious or cruel
25  manner.  15 CAL. CODE REGS. § 2281(c)(1).  The facts of a commitment offense can alone be a
26  sufficient basis for denying parole where they are especially heinous or particularly egregious.  *In*

10

*re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); *see also Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007);

*Sass v. Cal. Bd. Of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910

(9th Cir. 2003). In recent years, the Ninth Circuit Court of Appeals has cautioned that, given the

liberty interest that California prisoners have in their release on parole, a continued reliance on an

unchanging factor, such as a prisoner's commitment offense or pre-incarceration conduct, to support

a finding of unsuitability for parole may, over time, constitute a violation of due process where there

is evidence of rehabilitation and the prisoner has served the minimum term on his sentence. *Irons*,

505 F.3d at 852-53 (9th Cir. 2007). Here, the Board found that the nature of Petitioner's commitment

offense was especially heinous, atrocious and cruel. The relevant circumstances relied upon by the

Board were (1) that the offense was carried out in a dispassionate and calculated manner, 15 CAL.

CODE REGS. § 2281(c)(1)(B); (2) that the victim was abused, 15 CAL. CODE REGS. § 2281(c)(1)(C);

(3) that the offense was carried out in a manner demonstrating a callous disregard for human

suffering, 15 CAL. CODE REGS. § 2281(c)(1)(D) and; (4) that the motive for the crime was

inexplicable or very trivial in relation to the offense, 15 CAL. CODE REGS. § 2281(c)(1)(E). In so

finding, the presiding commissioner pointed to factors beyond the minimum element of the crime,

*In re Dannenberg*, 34 Cal.4th at 1071, stating that

> The offense was carried out in an especially cruel manner, in that the individual met the victim, Marian Jackson, age 31, extensively [sic] to purchase a car. After some discussion and driving to the subject's house, they went to a secluded area, he produced a gun, walked her away from the car, had her kneel down, fired two shots, the second shot – the first shot hit, striking her in the leg. She attempted to fake her death and the second shot was directed at her head. Had it been a more powerful weapon, we would probably be talking about a murder versus an attempted murder.

> But be that as it may, it was especially cruel. She begged for her – not only her life, but her children's lives. Mr. Montalvo knew that she had children because he has [sic] seen her the day previous with children. The offense was carried out dispassionately and, I must say, very calculated, this entire thing. While Mr. Montalvo does not acknowledge the plan, he certainly armed himself and knew that he was dealing with a female with children. So, there was certainly some calculation to your – to your efforts in getting that car that did not go unnoticed.

11

The victim was abused, in that she spent some time, when she realized she was going to be shot, whether it was 30 seconds or five minutes, begging for her life. That's abusive in any respect. Then, once being shot, in an effort to save her life, feigning death. He summarily fired another shot into her body, fortunately she did not suffer death as a result of it. The motive of the crime was, I guess, to conceal the act that he was about to participate in, which was the theft of the car. Somehow the inmate felt that he could take this car without paying for it, kill the woman and essentially have the car. I'm not sure I understand that reasoning, but the motive was extraordinarily trivial.

. . . .

The prisoner committed an offense in an especially cruel manner. Took this woman, Marian Jackson, age 31, extensively [sic] to purchase her car and took her out to a remote area and shot her twice, with the second one being a head shot. She begged and pleaded for her life and the lives of her children. That was all ignored and she was summarily shot. The offense, as stated before, was carried out dispassionately. The victim, as I've stated before, was abused in that she was forced to plead for her life, which were all ignored. The offense demonstrates a callous regard for human suffering. The motive was the concealment of the crime, which has its own peculiar aspects to it, because it's a stolen car that would've been found as stolen anyway.

(Pet. Ex. D at 79-85.)

The Board next considered Petitioner's criminal history. 15 CAL. CODE REGS. § 2281(b) & (c)(2). A prisoner's record of violence is an unsuitability factor where the prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim. *Id.* The Board found that Petitioner's criminal history, which consisted of numerous arrests and periods of juvenile probation for primarily theft related crimes, demonstrated an "escalating pattern of criminal conduct." (Pet. Ex. D at 82.) Petitioner's criminal history culminated with his 1987 arrest, at age 18, for the crime upon which his current period of incarceration is based, which the Board noted was "intended to be simply a theft related crime, but the circumstance presented itself, at least in the subjects – the inmate's mind, that he needed to escalate that theft to an attempted murder." (Pet. Ex. D at 69, 82) In addition to the statutorily specified circumstances tending to show unsuitability for parole, the Board is instructed to consider all relevant and reliable information, including any past

1    criminal history.  15 CAL. CODE REGS. § 2281(b).  The Board, therefore, properly considered

2    Petitioner's juvenile criminal history when making its parole suitability determination.

3           The Board next considered Petitioner's prison disciplinary record.  15 CAL. CODE

4    REGS. § 2281(c)(6).  A prisoner's institutional behavior can render him unsuitable for parole where

5    he has engaged in serious misconduct while incarcerated.  *Id.*  Petitioner has incurred eighteen

6    serious CDC 115 reports, as well as sixteen less serious CDC 128 reports since entering the

7    California Department of Corrections in 1987.  (Pet. Ex. D at  82.)    While all of Petitioner's

8    disciplinary violations were non-violent, the Board noted that all violations reflected behavior issues

9    that could have been avoided.  (Pet. Ex. D at 56) The Board further noted, however, that Petitioner

10   had been free from serious rule violations since 2001, and commended him for that accomplishment.

11   (Pet. Ex. D at 55-56)

12          The Board also relied on Petitioner's two most recent psychological assessments.  15 CAL.

13   CODE REGS. §2281(c)(5).  Psychological factors can demonstrate unsuitability for parole if a

14   prisoner has a history of mental problems relating to the commitment offense.  *Id.*  In addition,

15   reliable information concerning an inmate's past and present mental state is relevant to the Board's

16   determination regarding parole suitability.  15 CAL. CODE REGS. § 2281(b).  The December 2004

17   psychological assessment was completed by Dr. Ferguson, who diagnosed Petitioner with antisocial

18   personality disorder.  (Pet. Ex. D at 60.)  Dr. Ferguson noted that because Petitioner had, at that

19   point, spent half of his life incarcerated, he "required more supervision and structure to reintegrate

20   into society upon parole."  (Pet. Ex. D at 61.)  Dr. Ferguson further noted that Petitioner would

21   benefit from self-help programing focusing on "criminal thinking, victim awareness and active

22   parole adjustment planning."  (Pet. Ex. D at 61.)  The April 2007 assessment by Dr. Van Couvering

23   also diagnosed Petitioner with antisocial personality disorder and considered Petitioner to be "a

24   moderate risk...with regard to violence."  (Pet. Ex. D at 58-60, 83.)  Dr. Van Couvering found it

25   unclear whether Petitioner appreciated the gravity of the trauma experienced by the victim of his

26   crime, observing that Petitioner "had a tendency to minimize his life crime by saying that the

shooting was an accident and, in fact, the victim survived." (Pet. Ex. D at 58.).  Dr. Van Couvering

noted Petitioner's failure to engage adequately and continuously in self-help programming.  (Pet.

Ex. D at 59-60, 82.)

        The Board also considered Petitioner's insufficient participation in beneficial self-

help programming while incarcerated.  When questioned by the Board regarding whether he had

participated in self-help programming "to give [himself] a better understanding of what's been going

on in [his] mind during [his] criminal history...anything that would enlighten [him] on any of [his]

personality characteristics," Petitioner replied that he had not.  (Pet. Ex. D at 49)  In addition, the

Board expressed concern that Petitioner had begun, but failed to complete, numerous vocational

training courses.  The Board also noted that Petitioner had recently begun attending Alcoholics

Anonymous ("AA") meetings.  However, while Petitioner admitted to daily drug use prior to his

incarceration, he denied being an alcoholic or a drug addict. (Pet. Ex. D at 53).  Petitioner explained

his participation in AA to the Board, stating that "I came here in January and they told me, you

know, get self-help, get a trade, get some chronos, and the only self-help I could think of that's in

the system was AA or NA, so I went to the meetings."  (Pet. Ex. D at 63-63).  The Board seemed

concerned that Petitioner was unable to sufficiently articulate any of the twelve AA steps or his

gains from his participation in AA, and that Petitioner was unable to understand why the Board

would like to see more consistent participation by him in substance abuse programming.  The

Presiding Comissioner noted that

> the prisoner has programmed in a limited manner while incarcerated,
> and has failed to upgrade educationally.  We believe that there's an
> opportunity for you to do some more work educationally on yourself
> and vocationally, to secure some valid certificates on your behalf in
> terms of vocation, and certainly education doesn't hurt anyone.  We
> don't believe that you've participated sufficiently in self-help.  I've
> provided you with my insight, with regard to the AA 12 Step program
> that you're currently going to.  And I would encourage you to take
> advantage, if you don't believe you're an alcoholic or addicted to
> narcotics, at least steps four through 12.  So I reiterate this again.

(Pet. Ex. D at 82)

1    Lastly, the Board considered Petitioner's post-release plans with regard to residence

2    and employment.   While the lack of adequate parole plans does not necessarily indicate

3    unsuitability, under California law, the Board may consider "any other information which bears on

4    the prisoner's suitability for release."  15 CAL. CODE REGS. § 2281(b). The Board recognized that

5    residential plans presented a challenge to Petitioner due to his lack of friends or family members

6    residing within the state of California, but noted that

7                 those are reality for him and he has made some efforts to find
                 transitional housing, which we must admit, sounds like a good plan
8                 on his part.  But those come with certain problems themselves.  That
                 is you need a parole date or you need – you need some more definite
9                 commentary from the Parole Board to be able to get into those
                 programs.  But that is the course that you've taken and we believe
10                that's a good one, and we would encourage you to continue that with
                 regard to your residential plans.
11
12   (Pet. Ex. D at 83.)  With regard to employment, however, the Board concluded that Petitioner had

13   no acceptable plans.  (Pet. Ex. D at 83.)  In reference to Petitioner's limited vocational training, the

14   Board suggested that Petitioner "focus more on what it is [he] can do and get more training in that

     area."  (Pet. Ex. D at 83)
15
16   After weighing the above factors and noting that the Shasta County District Attorney

17   opposed Petitioner's release, the Board determined that Petitioner would pose an unreasonable risk

18   of danger to society or a threat to public safety if released from prison.  Although the Board

19   acknowledged Petitioner's gains since his 2005 parole suitability hearing, the Board found that his

20   efforts to remain disciplinary free since 2001 combined with his efforts in AA were insufficient to

     "outweigh the factors of unsuitability and the factors related to the crime."  (Pet. Ex. D at 84.)
21
22   Applying the federal *habeas corpus* review standard applicable to parole denials for

23   California state prisoners recently clarified by the Ninth Circuit, it appears that "some evidence"

24   supports the Board's determination that Petitioner was not suitable for parole at the time of his 2007

25   hearing.  As reviewed above, relevant portions of the evidentiary record support the recited factors

26   and their rational relationship to the determination that Petitioner would pose an unreasonable risk

to public safety if released.  In addition, all factors articulated by the Board as the basis for its decision are permissible considerations in parole suitability determinations under California law. 15 CAL. CODE REGS. § 2281(b)-(d).  This Court may not re-weigh the evidence before the Board, nor may the Court substitute its judgment for that of the Board.  Accordingly, Petitioner is not entitled to relief on the ground that the Board violated his due process rights by denying him parole.

B.     PETITIONER'S TERM OF IMPRISONMENT WAS NOT ALTERED WHEN THE BOARD FOUND PETITIONER UNSUITABLE FOR PAROLE

Petitioner claims that the Board's decision denying him a parole release date extended his term of imprisonment beyond the statutory maximum term of confinement for his convicted offense based on facts not proven beyond a reasonable doubt.  Petitioner's claim must fail because the Board did not, in fact, alter Petitioner's sentence in any way.  Petitioner was convicted of attempted wilful, deliberate, and premeditated murder.  Under California law, this crime carries a mandatory penalty of life imprisonment with the possibility of parole, CAL. PENAL § 664(a), and this is the sentence Petitioner is currently serving.  While Petitioner may have hoped or expected to be released sooner, the maximum duration of his commitment was set at life  long before he appeared before the Board.  The Board's decision to deny him a parole release date, therefore, did not enhance or otherwise alter his punishment.  Consequently, Petitioner is not entitled to relief of this claim.

C.     THE RELEVANT SECTIONS OF THE CALIFORNIA CODE OF REGULATIONS GOVERNING PAROLE DETERMINATIONS ARE NOT VOID OR UNCONSTITUTIONAL

Petitioner makes several claims regarding the constitutionality of the relevant sections of the California Code of Regulations governing parole determinations.  Petitioner first claims that CAL. PENAL § 3041 limits the factors permissibly considered by the Board in parole suitability determinations solely to the gravity of the commitment offense.  According to Petitioner, therefore, unless the Board concludes "that the gravity of the current of current or past convicted offense or offenses [] is such that consideration of the public safety requires a more lengthy period of

16

incarceration for this individual," 15 CAL. CODE REGS. § 3041, a parole release date must be set. Petitioner claims, therefore, that additional factors unrelated to the gravity of his commitment offense, such as his juvenile adjudications and failure to participate in self-help programming, are impermissible considerations in parole suitability determinations.  This is essentially an argument that the Board violated the California Code of Regulations in determining him unsuitable for parole, and as such, is a matter of state law.  Because  federal *habeas corpus* relief may be granted only for a violation of the Constitution or laws of the United States, the Court does not address this claim herein.  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal *habeas corpus* relief is not available to remedy alleged errors of state law).

Petitioner next claims that the regulations instructing the Board to rely on the gravity of an inmate's commitment offense to revoke an inmate's parole eligibility is unconstitutional because it is based on a capital murder special circumstance under California law, that the crime was heinous atrocious or cruel, which must be proven to a jury beyond a reasonable doubt because it increases the punishment for an inmate's commitment offense.  The rule referenced by Petitioner stems from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.  However, as the Supreme Court has explained, the *Apprendi* rationale does not apply to indeterminate sentencing within the permitted sentence range.  *Blakely v. Washington*, 542 U.S. 296, 309 (2004).  As discussed above, Petitioner's commitment offense was attempted wilful, deliberate and premeditated murder, a crime which carries a mandatory penalty of life with the possibility of parole.  CAL. PENAL § 664(a).  In the case of those sentenced to a term of life, as Petitioner was, the sentence is a life sentence until he is found suitable for parole.  *See In re Dannenberg*, 34 Cal. 4th 1061, 1083-84) (holding that "an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for 'this individual' by 'consideration of the public safety.'" (quoting Cal. Penal Code § 3041(b)).  Therefore, the Board's determination that he was not suitable for parole did not increase the punishment, which was up to life imprisonment, for Petitioner's commitment offense.

In addition, Petitioner is mistaken with regard to the role the Board plays in parole suitability determinations.  An inmate serving an indeterminate life sentence becomes eligible for parole after serving a minimum period of confinement.  *In re Dannenberg*, 34 Cal. 4th at 1078 (2005).  Such inmates may serve up to life in prison, but may be released on parole if they are deemed suitable by the Board after considering a variety of relevant and reliable factors.  *See* 15 CAL. CODE REGS. §§ 2402 and 2281.  The Board's unsuitability determination does not, therefore, revoke an inmate's eligibility for parole. Under certain circumstances, however, it is possible that life sentenced inmates eligible for parole may nonetheless never be deemed suitable for parole if the Board determines that they remain an unreasonable risk of danger to society.

Petitioner also claims the Board construes every indeterminately sentenced inmate's commitment offense as "especially heinous, atrocious, or cruel" and that there is no meaningful standard for narrowing the class of persons to which this factor applies.  This appears to be a claim that the California regulations governing consideration of parole are unconstitutionally vague. Generally, a regulation is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes or if it invites arbitrary and discriminatory enforcement." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989).  *See also Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1134 (9th Cir. 2007) ("To survive a vagueness challenge, the statute must be sufficiently clear to put a person of ordinary intelligence on notice that his or her contemplated conduct is unlawful.")  *See also Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (A statute must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited).  "[A] party challenging the facial validity of [a law] on vagueness grounds outside the domain of the First Amendment must demonstrate that the enactment is impermissibly vague in all of its applications." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotation marks omitted).  Moreover, "[t]he Due Process Clause does not require the same precision in the drafting of parole release statutes as is required in the drafting of penal laws." *Hess v. Board of Parole and Post-Prison Supervision*, 514

F.3d 909, 914 (9th Cir. 2008) (citing *Glauner v. Miller*, 184 F.3d 1053, 1055 (9th Cir. 1999)).

Petitioner's claim must fail because it ignores the five sub-factors set forth for the Board's consideration in determining whether an inmate's commitment offense was "especially heinous, atrocious, or cruel." These factors are set for in section 2281(c)(1)(A)-(E), and are identical to those set forth in section 2402(c)(1)(A)-(E). They include: (A) whether multiple victims were attacked, injured or killed in the same or separate incidents; (B) whether the offense was carried out in a dispassionate and calculated manner; (C) whether the victim was abused, defiled or mutilated during the offense; (D) whether the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human life; or (E) whether the motive for the crime is very trivial in relation to the offense. 15 CAL. CODE REGS. § 2281(c)(1)(A)-(E). Because the term "especially heinous, atrocious, or cruel" is further limited by these five detailed factors, it does not appear to be unconstitutionally vague. *See Arave v. Creech*, 507 U.S. 463, 470-78 (1993) (Idaho death penalty statute which cited as an aggravating factor that the crimes were carried out in "utter disregard for human life" was not impermissibly vague because limiting construction had been adopted defining this factor as demonstrating "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer"). Even if the challenged language is unconstitutionally vague, which it is not, the Board's reliance on several factors, other than factors related to the commitment offense, would still provide "some evidence" to support the Board's decision. *See Sass*, 461 F.3d at 1128-29.

In addition, the sections of the California Code of Regulations governing parole determinations have not been found to be unduly vague or overbroad under federal law. Nor has federal law been found to preclude the use of terms such as "especially cruel" or "callous" as guidelines in parole suitability evaluations. *Cf. Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988) (in a capital case, the "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague because it did not offer sufficient guidance to the jury in deciding whether to impose the death penalty); *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (noting that statutory aggravating circumstances in capital cases "may not be unconstitutionally vague"). Accordingly,

1   petitioner's challenge to California's parole statutes on vagueness grounds should be denied.

2        Lastly, Petitioner argues that the criteria tending to indicate suitability and

3   unsuitability promulgated in the Board's regulations are void because they violate the separation of

4   powers doctrine by encroaching on the power of the California Legislature to determine parole

5   eligibility for specific convicted offenses. *See* 15 CAL. CODE REGS. §§ 2402 and 2281. It is unclear,

6   however, whether Petitioner is claiming that the Board has violated the separation of powers

7   doctrine under the federal or state constitution. Regardless, Petitioner's claim must fail. A claim

8   that the Board violated the federal constitution is not cognizable because the federal doctrine of

9   separation of powers does not extend to the states under the Fourteenth Amendment. *See Hughes*

10  *v. Superior Court*, 339 U.S. 460, 467 (1950). A claim that the Board, a state agency, violated the

11  doctrine of separation of powers contained in the California state constitution does not give rise to

12  a claim for federal *habeas corpus* relief. *See Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

13  1985).

14  VI.    CONCLUSION

15       Accordingly, IT IS RECOMMENDED that Petitioner's petition for writ of *habeas*

16  *corpus* be denied.

17       These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one

19  days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties. Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

22  shall be served and filed within seven days after service of the objections. Failure to file objections

23  within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*,

24  158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any

25  objections he elects to file petitioner may address whether a certificate of appealability should issue

26  in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules

1  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

2  when it enters a final order adverse to the applicant).

3  DATED: June 28, 2010

4

5                                    CHARLENE H. SORRENTINO
                                     UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

21